UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                                    )
UNITED STATES OF AMERICA           )
                                                    )
         v.                                         )          Criminal No. 10-0298  (PLF)
                                                    )
CHARLES IKE EMOR,                       )
                                                    )
                Defendant.                        )
_____)

OPINION AND ORDER

         This matter is before the Court on the motion of the defendant, Charles Ike Emor,

to dismiss the criminal indictment against him or, in the alternative, for the return of seized

property.  The Court heard oral argument on the motion at a hearing held on June 27, 2011.

Upon consideration of the parties' arguments, the relevant legal authorities, and the entire record

in this case, the motion will be denied.[1]

I.  BACKGROUND

*A.  Allegations of the Indictment*

         The indictment alleges that Mr. Emor founded an entity called Sunrise Academy

("Sunrise") under the laws of the District of Columbia in 1999 as a tax-exempt, non-profit

organization.  Indict. ¶¶ 1-2.  Mr. Emor served as the president and executive director of Sunrise

and "maintained complete control over Sunrise financial affairs."  Id. ¶¶ 1, 26.  Organized as a

private school providing special education services to male students between the ages of 7 and

_____
         [1]        The papers reviewed in connection with the defendant's motion include the
following: the indictment ("Indict."); Mr. Emor's Motion to Dismiss or, in the Alternative, for
Return of Seized Funds to Sunrise Academy; the government's opposition to that motion
("Opp."); and the defendant's reply to that opposition ("Reply").

22, Sunrise entered into contracts with the District of Columbia to enroll as students varying numbers of District of Columbia residents who were entitled under federal law to receive special education services but could not obtain those services in the District's public schools. See id. ¶¶ 2, 5-9. Between 2005 and 2009, Sunrise was paid more than $30 million under its contracts with the District. Id. ¶ 15. Some of Sunrise's funding derived from the federal Medicaid program, which reimbursed Sunrise for counseling services that the school claimed to have provided to students who were Medicaid beneficiaries. See id. ¶ 11.

According to the indictment, large amounts of District of Columbia and/or federal funds — almost $500,000 — that were paid to Sunrise were not used to provide special education services, but instead were improperly diverted by Mr. Emor to cover such personal expenses as rent, the college tuition of his adult son, child support payments, and the costs of a variety of consumer goods, including jewelry, art, electronics, and "luxury vehicles." Indict. ¶ 51. In addition to those funds that were drawn directly from Sunrise and used for Mr. Emor's personal expenses, Mr. Emor also siphoned approximately $2 million from Sunrise into the bank accounts of a shell corporation. See id. ¶¶ 35-36. That entity, called Core Ventures, LLC ("Core"), was organized by Mr. Emor as a for-profit, limited liability company under the laws of the District of Columbia in June 2008. Id. ¶ 18. At that time, Mr. Emor had been sentenced to a term of twelve months plus one day in prison following his conviction in this Court on one count of conspiracy to commit mail fraud in connection with a scheme to sell stolen computers. See United States v. Emor, Crim. No. 06-0064, Judgment (D.D.C. Aug. 30, 2007). In June 2008, when he formed Core, Mr. Emor had not yet begun serving that sentence, which had been stayed

pending his appeal of his conviction.  See Crim No. 06-0064, Order to Stay Execution of Sentence (D.D.C. Aug. 30, 2007).

In March 2009, while his criminal appeal was still pending, Mr. Emor began transferring funds from Sunrise's bank accounts to Core's account, which could be accessed at that time only by Mr. Emor.  Indict. ¶¶ 18, 35.  By mid-July 2009, when his conviction was upheld by the court of appeals, Mr. Emor had allegedly transferred nearly $400,000 from Sunrise to Core.  Id. ¶ 35.  On July 21, 2009, four days after his conviction was upheld, Mr. Emor opened a second Core bank account and added as a signatory to both Core accounts a Sunrise employee referred to in the indictment as "Employee #1" and elsewhere in the filings as "J.N."  Id. ¶ 18. He also transferred another $1 million from Sunrise to Core accounts in August 2009.  Id. ¶ 35.

The last transfer of funds from Sunrise to Core occurred on January 10, 2010, three days after Mr. Emor was informed that he would begin serving his term of imprisonment on January 20, 2010.  Indict. ¶ 35; Crim. No. 06-0064, Order (D.D.C. Jan. 7, 2010).   By that point in time, approximately $2 million had been shifted from Sunrise's bank accounts to Core's.  See Indict. ¶ 35.  Of those funds, only approximately $36,000 had been spent — on a 2006 Lexus purchased for Mr. Emor's personal use.  Id. ¶ 38.  Core Ventures, managed solely by Mr. Emor, "had virtually no business operations, produced no products, and did not provide any services or generate[] any revenue."  Id. ¶ 18.

### B.  Indictment of Mr. Emor and Seizure of Assets

On May 18, 2010, a magistrate judge approved a warrant authorizing the seizure by the government of the funds held in Core's two bank accounts.  See Opp., Ex. A.  The magistrate judge found probable cause to believe that the assets were forfeitable based on the

affidavit of an FBI special agent who described, among other things, Mr. Emor's formation of Core, his transfer of large amounts of money from Sunrise to Core, and Core's apparent lack of any sort of business activity.  See id. ¶¶ 16-18, 26-30.

Beginning in August 2010, counsel representing Sunrise, Core, and/or Mr. Emor made several attempts to persuade the government to release the seized assets.  In a letter to an Assistant United States Attorney dated August 6, 2010, attorney Peter R. Zeidenberg, acting on behalf of Sunrise, asserted that the money seized from Core's bank accounts had been a legitimate loan extended to Core by Sunrise so that Core could "open up coffee and smoothie shops in the area that would then hire former [Sunrise] students who were otherwise unable to find employment."  Opp., Ex. B at 2.  He claimed that the seized assets "belong[] to [Sunrise], . . . notwithstanding that [they were] temporarily residing in the account of Core Ventures."  Id. at 3.  According to Mr. Zeidenberg, Sunrise "desperately needed" the seized funds because it had "many outstanding and legitimate bills that it must pay" and was "unable to pay any severance to its nearly 50 teachers and aids [sic]."  Id.

In response to Mr. Zeidenberg's letter, the government requested documentation of Sunrise's financial condition and of the loan that Sunrise claimed to have made to Core.  See Opp., Ex. J at 1-4.  Mr. Zeidenberg responded by sending another letter, dated September 1, 2010, in which, among other things, he asserted that "[t]he Government ha[s] asked [Sunrise] whether it intends to pay legal fees for the defense of its former Chairman, Charles Emor, and has either inquired or expressed concern on several occasions that [Sunrise] might use its funds to fund Mr. Emor's defense."  Opp., Ex. K at 2.  Mr. Zeidenberg did not specify who had expressed such "concern" or when the government had inquired whether Sunrise would pay the

legal fees of Mr. Emor; the record contains no evidence, other that Mr. Zeidenberg's letter, that the government was interested in Mr. Emor's legal fees. The government notes that the sole reference to legal fees in its August 13, 2010 letter was to *Sunrise's* legal fees. <u>See</u> Opp., Ex. J at 3. Nevertheless, Mr. Zeidenberg went on in his September 1, 2010 letter to insinuate that the government was attempting to prevent Sunrise from paying Mr. Emor's legal expenses, in violation of the law and the policy of the Department of Justice. <u>See</u> Opp., Ex. K at 2. He further accused the government of sending the message that "if [Sunrise] wants this money back, it better not even consider paying Mr. Emor's legal bills." <u>Id</u>. In response to Mr. Zeidenberg's allegations, the government stated that it "continue[d] to believe in the legal justification for the seizure" and did "not believe that the legal framework and current factual circumstances of this case warrant release of the funds." Opp., Ex. L; <u>see also</u> Opp. at 14.

A grand jury returned the pending indictment against Mr. Emor on November 3, 2010. The indictment originally charged Mr. Emor with 10 counts of mail fraud, 13 counts of wire fraud, 2 counts of interstate transportation of stolen property, 1 count of theft from a program receiving federal funds, 9 counts of money laundering, 1 count of first-degree theft, and 1 count of first-degree fraud. <u>See</u> Emor Indict. ¶¶ 54-72. Fifteen of those counts — alleging mail and wire fraud — have since been dismissed with prejudice on the motion of the government. The indictment also alleges that certain property of Mr. Emor is subject to forfeiture. <u>Id</u>. at 31-34. Among the property allegedly subject to forfeiture to the United States are the assets seized from Core's bank accounts. <u>See id</u>. at 31, 33.

On March 31, 2011, Sunrise and Core filed a miscellaneous action in which they moved for the "return" to Sunrise of the funds seized from Core's bank accounts.[2] Sunrise claimed that it needed the seized assets to run a coffee shop, see Sunrise Academy v. United States, Misc. No. 11-0172, Reply in Support of Motion for Return of Property at 2 (D.D.C. Mar. 31, 2011), and/or to meet "charitable obligations," id. at 3, and/or to pay for Mr. Emor's legal fees, id., and/or to run an "after school educational enrichment program," id. at 2, and/or to provide "free, after-school SAT preparation services." Id. The Court denied Sunrise/Core's motion, finding that as third-parties not involved in Mr. Emor's criminal proceedings, they are barred by statute from challenging the forfeiture at this time and do not have a due process right to an immediate hearing. See Sunrise Academy v. United States, Misc. No. 11-0172, 2011 WL 2418909 (D.D.C. June 17, 2011).

## II. DISCUSSION

Mr. Emor requests two forms of relief in connection with the government's seizure and continuing possession of the nearly $2 million formerly held in Core's bank accounts. First, he argues that the government seized the assets in question for the purpose of preventing the payment of his legal fees by Sunrise, and suggests that the indictment against him should be dismissed in light of this alleged prosecutorial misconduct. See Mot. at 7-14. Second, and in the alternative, Mr. Emor asks that if the indictment against him is not dismissed, the government be required to demonstrate at a pretrial evidentiary hearing that there is probable

---

[2]    It is unclear who currently controls Sunrise and/or Core, and so it is not clear who authorized counsel for either entity to file the miscellaneous action and seek the relief requested.

cause for the government's continuing restraint of the seized assets. See id. at 14-16. Mr. Emor, however, has failed to show that he is entitled to either form of relief.

*A. Dismissal of the Indictment*

Mr. Emor contends that the government has committed misconduct because it supposedly has seized assets from Core's accounts in order to deny him his Sixth Amendment right to counsel of choice. Mot. at 7-8. He argues that this alleged misconduct warrants the dismissal of the indictment, a result that he maintains is justified in light of the Second Circuit's decision in United States v. Stein, 541 F.3d 130 (2d Cir. 2008).

Under the Sixth Amendment, a criminal defendant has the "right to spend his own money to obtain the advice and assistance of . . . counsel." Caplin & Drysdale, Chartered v. United States, 491 U.S. 617, 626 (1989) (internal quotation marks and citation omitted). The Second Circuit held in Stein that this right is violated when the government, without other justification, intervenes to prevent a corporation under investigation from advancing legal fees to indicted employees. See United States v. Stein, 541 F.3d 130, 156 (2d Cir. 2008). Stein concerned the government's investigation of possible malfeasance at KPMG. When KPMG management learned of the investigation, they informed concerned employees that, in keeping with the company's practice, any legal fees incurred by those employees would be paid by KPMG. See id. at 137. During their investigation, however, federal prosecutors warned KPMG that the company was more likely to be prosecuted if it did not cooperate with them — and that advancing legal fees to employees who exercised their Fifth Amendment right against self-incrimination or otherwise refused to cooperate with investigators would be taken as a sign that the company was not cooperating. Id. at 137-38. As a result, when some of its employees were

7

indicted, KPMG elected not to pay their legal fees.  Id. at 139-40.  KPMG's withholding of financial assistance that it would have provided if not for the government's interference limited the ability of some indicted employees to retain counsel of their choice, and restricted the scope of the defense available to all of the indicted employees.  See id. at 144-45.

Holding that "the Sixth Amendment protects against unjustified governmental interference with the right to defend oneself using whatever assets one has or might reasonably and lawfully obtain," the Second Circuit ruled that the government's interference with KPMG's policy of advancing legal fees constituted a violation of the Sixth Amendment rights of the thirteen indicted KPMG employees.  United States v. Stein, 541 F.3d at 156.  Because that violation had severely prejudiced the defendants by limiting the defense they were able to present, the only sufficient remedy was dismissal of the indictments.  Id. at 157.

Mr. Emor's attempt to analogize his circumstances to those of the Stein defendants is unpersuasive.  First, there is no creditable evidence of prosecutorial misconduct in this case.  In advance of criminal trials, the government often seeks either the seizure or the restraint of liquid assets traceable to the charged criminal conduct; pretrial restraint of forfeitable assets is expressly authorized by statute for the specific purpose of "preserv[ing] the[ir] availability."  21 U.S.C. § 853(e)(1); see also id. § 853(f) (authorizing the pretrial issuance of warrants for the seizure of assets).  Thus, unlike the choice of the prosecutors in Stein to threaten KPMG and thus deter it from paying the legal fees of its employees, the pretrial restraint of likely forfeitable assets is legally and factually justified by goals unrelated to any desire by the government to interfere with the payment of the legal fees of criminal defendants.

Mr. Emor's unconvincing attempts to attribute bad motives to the prosecutors in his case do nothing to undermine the conclusion that those prosecutors had reasonable and legitimate grounds for arranging for the pretrial seizure of the assets in question. The only evidence that the government had any interest at all in the matter of Mr. Emor's attorney's fees is the allegation in Mr. Zeidenberg's September 1, 2010 letter that the government had asked whether Sunrise would be paying Mr. Emor's legal fees. Even if an agent of the government did in fact make such an inquiry — although the government denies that it was interested in this issue — such an inquiry standing alone is no evidence of impropriety. Mr. Zeidenberg's allegations that any inquiries by the government were intended to intimidate Sunrise and discourage it from assisting Mr. Emor are simply unsupported by any record evidence.

Second, Mr. Emor's circumstances differ drastically from those of the <u>Stein</u> defendants in that he has made — and could make — no claim that the government's actions have caused him irreversible prejudice. The indictments in <u>Stein</u> were dismissed because the district court found as a factual matter that some defendants had been deprived of their counsel of choice by the government's interference, and that all defendants had been significantly impaired in their ability to answer the charges against them. <u>See</u> <u>United States v. Stein</u>, 541 F.3d at 145. Mr. Emor, in contrast, has not identified any way in which his efforts to assemble a defense have been damaged by the continuing restraint of Core's assets.

Given the fundamental differences between the scenario presented in <u>Stein</u> and the one presented by Mr. Emor, the Court declines to dismiss the indictment. It also declines to hold an evidentiary hearing, requested for the first time by defense counsel during oral argument, for

the purpose of investigating Mr. Emor's accusations against the government.[3] Such a hearing is

typically held so that a party or parties may *present* evidence — not conduct a fishing expedition

in the hopes of substantiating baseless allegations against the government.

### B.  Request for a <u>Monsanto</u> Hearing

Mr. Emor also asks, if the Court declines to dismiss the charges against him, that

the government be required to present evidence of the forfeitability of the seized assets at a

pretrial probable cause hearing — often called a <u>Monsanto</u> hearing after <u>United States v.

Monsanto</u>, 924 F.2d 1186 (2d Cir. 1991), which first established when such a hearing might be

required.  <u>See</u> Mot. at 14-16.  Both a grand jury, in returning the indictment against Mr. Emor,

and Magistrate Judge Kay, in approving the seizure warrant, have already found probable cause

to believe that the seized assets are forfeitable.  Those findings, however, were made in

nonadversarial (*i.e.*, *ex parte*) proceedings.

In this circuit, a criminal defendant is entitled by the Fifth Amendment's Due

Process Clause to a pretrial, adversarial probable cause hearing on the issue of forfeitability if

"access to the assets [in question] is necessary for an effective exercise of the [defendant's] Sixth

Amendment right to counsel."  <u>United States v. E-Gold, Ltd.</u>, 521 F.3d 411, 421 (D.C. Cir.

2008).  The court of appeals has not, however, held that a defendant must receive such a hearing

simply because he claims that he needs the assets for legal fees.  In <u>E-Gold</u>, a magistrate judge

had found that the defendants were in such financial straits that they qualified for the

appointment of counsel, <u>see id</u>. at 413, and the court of appeals noted that its ruling applied "in a

---

[3]  His papers request a <u>Monsanto</u> hearing in connection with the alternative relief he
seeks, not a <u>Stein</u> hearing in connection with his motion to dismiss the indictment.

case in which [defendants] have demonstrated the inability to retain counsel of their choice without access to the seized assets." Id. at 415.

Every court that has addressed the issue has found that a defendant's merely conclusory allegation that he lacks the funds to retain counsel of choice is insufficient to trigger the need for a Monsanto hearing; in order to obtain a hearing the defendant must present some evidence that he will be deprived of counsel of choice if he cannot access the seized assets. See United States v. Farmer, 274 F.3d 800, 804 (4th Cir. 2001) (if defendant does not make "a threshold showing that [he] is without funds to hire the attorney of his choice," he has no due process right to a Monsanto hearing); United States v. Jones, 160 F.3d 641, 647 (6th Cir. 1998) (defendant must show both that "she has no assets, other than those restrained, with which to retain private counsel and provide for herself and her family" and that there is a "bona fide reason to believe the grand jury erred in determining that the restrained assets" are subject to forfeiture); United States v. Michelle's Lounge, 39 F.3d 683, 695 (7th Cir. 1994) (Monsanto hearing held only "if the district court finds that the defendant has no other assets with which to hire his attorney of choice"); United States v. Egan, Crim. No. 10-191, 2010 WL 3000000, at * 5 (S.D.N.Y. July 9, 2010) ("[A]s a condition precedent to a pre-trial hearing, there must be some showing that the restrained funds are necessary to fund a legal defense. [Monsanto] cannot be read to suggest that due process requires a hearing whenever a defendant merely prefers to use restrained funds rather than untainted assets to pay his counsel of choice.").

To obtain a Monsanto hearing, then, Mr. Emor must show that (1) he lacks the funds he requires to hire counsel of choice, and, as a necessary corollary, (2) the seized assets, if released, would be used to pay his legal fees. He has not made either showing. As to the first

required showing, Mr. Emor has filed a bare-bones form in which he claims that he lacks any income or investments, that his spouse is not employed, that he has six dependents, and that he has "only between $22,000 and $50,000 in 'cash on hand or money in savings or checking accounts,'" MTD Reply at 19; see Reply, Ex. A. Even a plaintiff who wishes to waive the $355 filing fee in a civil case must file a more detailed and specific financial statement. See Application to Proceed in District Court Without Paying Fees or Costs, *available at* http://www.uscourts.gov/uscourts/FormsAndFees/Forms/AO240.pdf (requiring from the applicant, among other information, a listing of any "thing of value that I own, including any item of value held in someone else's name," a listing of the type and amount of any "regular monthly expense," and a description of the types and amounts of "[a]ny debts or financial obligations"). Furthermore, Mr. Emor has provided the Court with absolutely no reason to believe that his current counsel — privately retained attorneys from Duane Morris, LLP — are not his counsel of choice, that he is in danger of losing the services of those counsel, or that those counsel have restricted or will restrict their defense of him because of a lack of funds. The Court has no way of knowing whether or how much these counsel have already been paid, or whether further fee payments are required, and in what amount. In other words, the record is simply bare of any evidence suggesting that Mr. Emor's defense is endangered by a lack of funds.

This lack of evidence is compounded by the absence from the record of any information regarding Sunrise's current financial condition. Sunrise has many times represented that it would, if the seized assets were released, use some portion of those funds to cover Mr. Emor's legal expenses. But no legal authority of which the Court is aware can "be read to suggest that due process requires a hearing whenever a defendant merely prefers to use restrained

funds rather than untainted assets to pay his counsel of choice." United States v. Egan, 2010 WL 3000000, at * 5. By the same token, there is no reason to believe that due process requires a hearing whenever a third-party wishes to cover a defendant's legal expenses using seized assets in lieu of other, more readily available assets. If Sunrise is able, without making any unreasonable sacrifices, to advance Mr. Emor's legal fees even if no seized funds are released, then there is no need for a Monsanto hearing. But the record reveals absolutely nothing of Sunrise's current financial status.

With respect to the second showing that must be made by Mr. Emor — that some portion of the seized assets, if released, would be available for the payment of his legal fees — the record is also deficient. For all Sunrise's unsupported protests to the contrary, the funds in question were seized from *Core's* bank accounts, not Sunrise's. Even if, as Sunrise claims, those funds were properly loaned to Core, loaned funds do not, in the ordinary course, automatically revert to the possession of the lender when the borrower fails to make timely repayment; the lender is merely an unsecured creditor of the borrower and has no particularized interest in any specific assets of the debtor. See, e.g., In re Treco, 240 F.3d 148, 160 (2d Cir. 2001) ("'[T]he position of a secured creditor, who has rights in the specific property, differs fundamentally from that of an unsecured creditor, who has none.'" (quoting Louisville Joint Stock Land Bank v. Radford, 295 U.S. 555, 602 (1935))). Sunrise has presented no factual or legal scenario under which the seized assets, if released, would revert automatically to Sunrise. Sunrise has suggested that Core is willing to grant a "waiver" of its interest in the funds, see Opp., Ex. B at 3, but there is no evidence in the record that such a waiver has been granted, nor is it clear that such a waiver

would be sufficient to ensure that Sunrise would be the proper recipient of any released funds. And of course, if Sunrise is not the owner of the funds, then it cannot use them to pay for legal fees.

As the foregoing analysis indicates, Mr. Emor has fallen far short of the threshold showing required to justify the holding of a <u>Monsanto</u> hearing. Defense counsel suggested at oral argument that he could supply the evidence needed to make that showing at the <u>Monsanto</u> hearing itself. He misunderstands the nature of the *threshold* requirement; there is no hearing until the defendant has *first* made the requisite showing, which he has not. Accordingly, for the foregoing reasons, it is hereby

ORDERED that [22] [23] the defendant's Motion to Dismiss or, in the Alternative, for Return of Seized Funds to Sunrise Academy is DENIED.

SO ORDERED.

/s/_____
PAUL L. FRIEDMAN
United States District Judge

DATE: July 1, 2011

14